Filed 7/7/26  P. v. Rauda CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B331030 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA476023) |
| v. | |
| ANTHONY RAUDA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Affirmed.

Elizabeth Richardson-Royer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

## INTRODUCTION

Anthony Rauda appeals from a judgment that sentences him to 119 years to life in state prison for murder, attempted murder, and commercial burglary. Rauda first contends the trial court prejudicially erred when it denied his motion to set aside the grand jury indictment on two attempted murder counts because the grand jury was improperly instructed on the kill zone theory. Rauda next argues a firearms expert's testimony about the ballistics testing and conclusions reached by a second firearms expert violated the Confrontation Clause, and his trial counsel performed ineffectively when he failed to object to the testimony. Lastly, Rauda contends the trial court prejudicially erred when it excluded third-party culpability evidence that raised a reasonable doubt as to his guilt. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2018, a grand jury returned an indictment against Rauda alleging he committed a series of shootings and burglaries in Malibu from 2016 to 2018 as follows: first degree murder of Tristan Beaudette (count 1); attempted murders of Beaudette's daughters (counts 2 and 3); attempted murder of Ian Kincaid (count 4); attempted murders arising from shootings in the Malibu area from 2016 to 2017 (counts 5 to 11); and second degree commercial burglary of three Malibu businesses in 2018 (counts 12 to 16). The indictment also included firearm special allegations.

2

A.    *Facts Underlying the Charged Offenses*

Counts 1 to 3 of the indictment alleged one count of murder of Beaudette and two counts of attempted murder of his two daughters. At trial, the prosecution presented evidence that on June 22, 2018, Tristan Beaudette and his brother-in-law Scott McCurdy were camping with their young children at Malibu Creek State Park. Beaudette slept in one tent with his two daughters, and McCurdy slept in a separate tent with his two sons. At approximately 4:30 a.m., McCurdy woke to several "loud pops" and then heard one of Beaudette's daughters crying. He discovered Beaudette dead in his tent with a gunshot wound to his head. A neighboring camper heard four to five gunshots and called 911. Beaudette's two daughters were in the tent and survived the shooting.

The deputy medical examiner recovered a single bullet from Beaudette's body. Beaudette's tent had three bullet holes, one toward the bottom near Beaudette's head and two holes that were consistent with a single bullet entering and exiting the tent. Deputies using metal detectors found five shell casings near Beaudette's tent and one spent bullet.

Counts 4 to 7 of the grand jury indictment charged Rauda with attempted murder involving shooting at cars traveling along Las Virgenes Road in the pre-dawn hours. The People presented evidence of the shootings as follows.

In count 4, Rauda was alleged to have shot at Ian Kincaid on June 18, 2018, at approximately 4:15 a.m. Kincaid was driving his white Tesla north on Las Virgenes Road near a Hindu temple when he heard four successive clicking noises. The car alerted Kincaid that the front hood latch had released. Kincaid pulled over, closed the hood, and continued to his work at

3

Universal Studios.  He did not notice anything was amiss because it was still dark.  Kincaid later noticed a hole in the hood of his car.  A firearms expert who was at Universal Studios to teach actors how to use firearms safely told Kincaid he believed it was a bullet hole.

Counts 5 and 6 alleged Rauda shot at Nicole Katz and her friend while they were traveling south on Las Virgenes Road near the Hindu temple on July 22, 2017, at approximately 4:30 a.m. in Katz's white BMW.  Count 7 alleged that on June 8, 2017, at approximately 4:30 a.m., Rauda shot at Thomas Marshall's white Porsche on Las Virgenes Road near the Hindu temple.

In counts 8 to 11, the indictment alleged Rauda shot at several people who were camping overnight at the Malibu Creek State Park campground where Beaudette was shot.  Counts 8 and 9 alleged Rauda shot at Meliss Tatangelo and Frank Vargas while they were asleep in the back of her SUV at the campground.  Count 10 alleged Rauda fired at Ronald Carson while he was sleeping in his trailer at the campground on the night of November 9, 2016.  Count 11 alleged Rauda shot James Rogers in the arm while he slept in a hammock in the campground during the night of November 2, 2016.

Counts 12 to 16 alleged Rauda committed second-degree commercial burglary of three Malibu businesses from July to October 2018.  Surveillance video from the businesses showed a masked individual carrying a rifle breaking into the buildings and leaving with food.  Boot prints with a distinctive heel strike pattern were found at the businesses.

4

B.    *Grand Jury Proceedings*

Grand jury proceedings were held from October 15, 2019 to October 21, 2019.  Forty-seven prosecution witnesses testified, and 204 exhibits were admitted into evidence.  The People's theory was that the first series of shootings involved a homemade shotgun, but that Rauda later obtained a Ruger 9mm rifle, and he used the Ruger to carry out the final two shootings of Kincaid and Beaudette.  The prosecutor highlighted the similarities between the shootings, including that they occurred along Las Virgenes Road or at the Malibu Creek State Park campground; that they occurred between 2:40 a.m. and 5:00 a.m.; and that white luxury cars traveling on Las Virgenes Road were targeted.

The grand jury returned an indictment as described on October 21, 2019.  On January 3, 2020, Rauda filed a motion to set aside the indictment.[1]  Relevant to this appeal, Rauda argued the prosecution improperly relied on the kill zone theory as to counts 2 and 3, which alleged the attempted murders of Beaudette's daughters.  Rauda argued the evidence was insufficient to support a kill zone theory of liability because the evidence of the holes in the tent established only two bullets were fired into a tent containing three people.  Additionally, Rauda argued the prosecutor misadvised the grand jury of the requirements to indict him under a kill zone theory.  The court denied Rauda's motion to set aside the indictment as to counts 2 and 3.  The court later denied a motion for rehearing or reconsideration on this issue.

---

[1]    The People's request for judicial notice of the motion to set aside the indictment is granted.  (Cal. Rules of Court, rule 8.340(c).)

5

C.    *Trial*

At trial, the People presented evidence as described above, as well as evidence of Rauda's arrest and the links between the burglaries and the shootings.  The People presented evidence that police officers investigating the burglaries followed tracks from one of the businesses with a scent dog and discovered Rauda in a nearby ravine.  Rauda was dressed in dark clothing and carrying a backpack with a rifle sticking out of it.  When officers ordered Rauda to put his hands in the air, he yelled, "Fucking shoot me.  Fucking shoot me."  After Rauda complied and dropped his backpack, the officers took him into custody.  Rauda wore boots that had the distinctive heel strike pattern found at the Malibu businesses that were burgled.  The officers later discovered a permanent encampment hidden under a tree nearby that contained a cooler, a tent, clothing, electronics, and cooking supplies.

The People linked Rauda to the shootings in Malibu Creek State Park campground and on Las Virgenes Road by presenting evidence of ballistics testing, his internet search history, and the location of his devices around the time of the offenses.  When Rauda was arrested, the officers recovered a rifle, 9 mm ammunition, a cell phone, a laptop, electronic tablets, a jacket, blue latex gloves, a wallet, and a piece of paper listing several email addresses from his backpack.  Location data placed Rauda's devices at Malibu Creek State Park around the time of the shootings in counts 5 to 10.

Additionally, firearms expert Manual Munoz identified the rifle in Rauda's backpack as a Ruger 9 mm carbine.  He concluded the bullets that hit Kincaid's Tesla and killed Beaudette were fired from the Ruger.  The ammunition recovered

6

by deputies from Rauda was by the same manufacturer as the shell casings recovered from the area surrounding Beaudette's tent.

On June 4, 2018, two weeks before the Kincaid shooting, Rauda's internet searches included: " 'bullet hits gas car tank,' " " 'ballistics, is it possible for a bullet to puncture a gas tank without causing it to explode?' " and " 'nine-millimeter incendiary bullets.' " On June 23, 2018, the day after the Beaudette killing, Rauda searched for " 'Malibu Creek State Park' " and visited the Los Angeles Times website to pull up a story about the shooting. Rauda's electronic devices revealed he viewed and searched for information relating to firearms, munitions, burglary, and eluding pursuit.

The prosecutor did not argue the attempted murders were committed under a kill zone theory, and the jury was not instructed on that theory.

The jury found Rauda guilty of: (1) second degree murder of Beaudette as to count 1 (§ 187, subd. (a)), with findings that he personally and intentionally discharged a firearm causing death and personally used a firearm (§ 12022.53, subds. (b)-(d)); (2) attempted murder of Beaudette's daughters as to counts 2 and 3 (§§ 187/664) with findings that he personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)); (3) willful, deliberate, and premeditated attempted murder of Kincaid as to count 4 (§§ 187/664) with findings that he personally and intentionally discharged a firearm and personally used a firearm (§ 12022.53, subds. (b), (c)); and (4) second degree commercial burglary of the three Malibu businesses as to counts 12 through 16 (§ 459) with findings as to counts 13 and 14 that he was personally armed with a firearm (§ 12022,

7

subd. (a)(1)).  The jury found Rauda not guilty of the shootings in 2016 and 2017 as alleged in counts 5 through 11.  The trial court sentenced Rauda to a total term of 119 years to life in state prison.

Rauda timely appealed.

## DISCUSSION

A.    *Motion To Dismiss Indictment*

Rauda contends the trial court prejudicially erred when it denied his motion to set aside the grand jury indictment in counts 2 and 3 for the attempted murder of Beaudette's daughters.  According to Rauda, the prosecution's use of the kill zone theory was legally and factually inaccurate because "[t]here is no evidence whatsoever that Appellant had in mind a 'primary target' in shooting at the Beaudette's tent.  There is no evidence that he knew the identities of the people inside the tent, or indeed how many people were inside it."  Rauda argues, "if a defendant fires indiscriminately, intending to kill everyone in the path of his bullets without a distinguishable *primary* target, the kill zone theory of liability is inapplicable."

1.    *Standard of Review*

"[I]t is the grand jury's function to determine whether probable cause exists to accuse a defendant of a particular crime." (*Cummiskey v. Superior Court* (1992) 3 Cal.4th 1018, 1026 (*Cummiskey*).)  The standard of proof required for an indictment is sufficient cause, which, like probable cause, only requires evidence that, when unexplained or uncontradicted, creates a strong suspicion of the guilt of the accused.  (*Id.* at p. 1025.)

As a general rule, "the prosecution has no duty to instruct a grand jury on the law in the same manner a trial judge must instruct a petit jury." (*People v. Gnass* (2002) 101 Cal.App.4th 1271, 1306 (*Gnass*).) "However, a claim of instructional error is a cognizable basis for a motion to set aside an indictment under Penal Code section 995, subdivision (a)(1)(B), in that it is 'manifestly tantamount' to a claim the grand jury, as instructed, may have indicted the defendant on less than reasonable or probable cause." (*Id.* at pp. 1306–1307.)

On review of a motion to set aside a grand jury indictment, we must decide de novo whether, drawing all reasonable inferences in favor of the indictment, the evidence presented to the grand jury was sufficient to support a "strong suspicion" the defendant committed the charged crime. (*Cummiskey, supra*, 3 Cal.4th at p. 1029; *People v. Pic'l* (1982) 31 Cal.3d 731, 737; *Gnass*, *supra*, 101 Cal.App.4th at pp. 1288–1289.) We " ' "in effect disregard[ ] the ruling of the superior court and directly review[ ] the determination of the [grand jury] holding the defendant to answer." [Citations.] Insofar as the . . . section 995 motion rests on issues of statutory interpretation, our review is de novo. [Citation.] Insofar as it rests on consideration of the evidence adduced, we must draw all reasonable inferences in favor of the [indictment] [citations] and decide whether there is probable cause to hold the defendants to answer, i.e., whether the evidence is such that "a reasonable person could harbor a strong suspicion of the defendant's guilt[.]" ' " (*People v. Johnson* (2012) 209 Cal.App.4th 800, 808 quoting *Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1072.) A defendant challenging errors occurring before the grand jury "must show the 'alleged errors before the grand jury deprived him of a fair trial or otherwise resulted in

9

any actual prejudice relating to his conviction' " before reversal on the ground of such irregularity is warranted.  (*People v. Jablonski* (2006) 37 Cal.4th 774, 800 (*Jablonski*).)

       2.    *Kill Zone Theory*

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' " (*People v. Canizales* (2019) 7 Cal.5th 591, 602 (*Canizales*).)  The kill zone is a "theory for establishing the specific intent to kill required for conviction of attempted murder." (*Id.* at p. 607.)  Under the theory, "a defendant may be convicted of the attempted murder of an individual who was not the defendant's primary target." (*Id.* at p. 596.)  "The kill zone theory is one of concurrent intent—the defendant has the intent to kill a particular target, and the jury can infer from the method employed to attempt killing the primary target a concurrent intent to kill those around the primary target to ensure the primary target's death." (*People v. Medina* (2019) 33 Cal.App.5th 146, 154–155 (*Medina*); see *People v. Mumin* (2023) 15 Cal.5th 176, 193 (*Mumin*) ["a kill zone is an area which a defendant intentionally creates in order to kill all those within it to ensure the primary target's death"]; *People v. Bland* (2002) 28 Cal.4th 313, 330 (*Bland*).)  The kill zone theory thus pertains to circumstances in which a jury may infer an intent to kill, but it does not dispose of the requirement that the jury find an intent to kill and instead allows the jury to impute malice.  (*Medina, supra,* 33 Cal.App.5th at p. 155.)  The kill zone theory "is not a legal doctrine requiring special jury instructions" but rather "is

10

simply a reasonable inference the jury may draw in a given case." (*Bland*, *supra*, 28 Cal.4th at p. 331, fn. 6.)

B. *Rauda Has Failed To Demonstrate He Was Prejudiced By the Kill Zone Instruction Because the Evidence Presented to the Grand Jury Was Sufficient To Support a "Strong Suspicion" Rauda Committed Attempted Murder Under a Theory of Express Malice*

Rauda contends the kill zone theory is inapplicable in this case because there was no evidence of a primary target. Even assuming Rauda is correct that the grand jury was improperly given a kill zone instruction, however, Rauda has failed to demonstrate prejudice.[2] This is because the grand jury was also instructed on express malice, and the evidence presented to the grand jury was sufficient to support a "strong suspicion" Rauda committed attempted murder under a theory of express malice.

*People v. Stone* (2009) 46 Cal.4th 131, 136–138 (*Stone*) is instructive. In *Stone*, the defendant fired a single shot from 10 to 15 feet away at a group of approximately 10 people. The information alleged one count of the attempted murder of Joel F., one of the 10 individuals in the group. The evidence established, however, that the defendant did not fire the gun at any particular

---

[2]    Rauda contends reversal is required because the error was not harmless beyond a reasonable doubt. (*People v. Mumin* (2023) 15 Cal.5th 176, 207; see *Chapman v. California* (1967) 386 U.S. 18.) The People contend the appropriate standard for prejudice in this case is whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.) For reasons we explain below, the error is harmless under either standard.

person, but rather, at the group. The prosecutor conceded at trial that "he had not proven that defendant intended specifically to kill Joel F. rather than *someone* in the group of 10 persons." (*Id.* at p. 139.)

*Stone* held the kill zone theory did not apply because the evidence demonstrated the defendant intended to kill "someone" in the crowd, but did not specifically intend to kill Joel F. Thus, there was no primary target from which a kill zone could extend. (*Stone, supra,* 46 Cal.4th at p. 139.) *Stone* found these facts nevertheless supported an attempted murder conviction because: "An indiscriminate would-be killer is just as culpable as one who targets a specific person. . . . [A] terrorist who simply wants to kill as many people as possible, and does not know or care who the victims will be, can be just as guilty of attempted murder." (*Id.* at pp. 140–141; accord, *Medina, supra,* 33 Cal.App.5th at p. 156 ["A jury can reasonably conclude a defendant without a primary target who repeatedly shoots into a crowd with the intent to kill committed multiple counts of attempted murder"]; *People v. McCloud* (2012) 211 Cal.App.4th 788, 798–799 ["the discussion in *Stone* makes clear that . . . a defendant can be convicted of several attempted murders if he intended to kill several people, even if there were no particular people he intended to kill"].)

Under the circumstances presented, any error in instructing the grand jury on the kill zone theory was harmless under *Watson* and harmless beyond a reasonable doubt under *Chapman* because both attempted murder theories on which the grand jury was instructed required a finding of intent to kill. In describing the crime of murder, the grand jury was instructed that " 'Malice' may be either express or implied. Malice is

12

express when there is manifested an intention unlawfully to kill a human being." It was then instructed that, "[i]n order to prove attempted murder, each of the following elements must be proved: . . . [¶] . . . A direct but ineffectual act was done by one person towards killing another human being; and, [¶] the person committing the act harbored express malice aforethought; namely a specific intent to kill unlawfully another human being." The grand jury was also instructed on the kill zone theory but it was advised that, "If 14 or more grand jurors do not believe that [Rauda] intended to kill [Beaudette's daughters] <u>or</u> intended to kill Tristan Beaudette [or his daughters] by killing everyone in the zone of fatal harm, then you must not indict [Rauda] for the attempted murder of [Beaudette's daughters]. [Emphasis added.]" These instructions informed the grand jury that it could indict Rauda for attempted murder only if he harbored the intent to kill.

As stated, "a claim of instructional error is a cognizable basis for a motion to set aside an indictment under Penal Code section 995, subdivision (a)(1)(B), in that it is 'manifestly tantamount' to a claim the grand jury, as instructed, may have indicted the defendant on less than reasonable or probable cause." (*Gnass, supra,* 101 Cal.App.4th at pp. 1306–1307.) And probable cause merely requires evidence that, when unexplained or uncontradicted, creates a strong suspicion of the guilt of the accused. (*Cummiskey, supra,* 3 Cal.4th at p. 1025.)

Accordingly, we review the grand jury indictment to determine whether, drawing all reasonable inferences in favor of the indictment, the evidence presented to the grand jury was sufficient to support a "strong suspicion" the defendant committed the charged crime of attempted murder. (*Cummiskey,*

13

*supra*, 3 Cal.4th at p. 1029.)  Here, the neighboring camper testified she heard four to five gunshots, and the deputies recovered five shell casings near Beaudette's tent.  The evidence that Rauda shot five times into or near a tent in a public campground at 4 a.m., even if he did not know how many persons or who specifically was inside the tent, is sufficient to support a strong suspicion he committed attempted murder under an express malice theory.  The evidence presented to the grand jury showed Rauda did not intend to kill a particular person; that is, he "simply want[ed] to kill as many people as possible, and [did] not know or care who the victims [were]."  (*Stone, supra,* 46 Cal.4th at p. 140.)  Indeed, the People stated to the grand jury that the primary target could be Beaudette or one of his daughters.  That the grand jury was also instructed on the kill zone theory does not require that Rauda's indictment be set aside because under both attempted murder theories the grand jury was instructed it had to find Rauda had an intent to kill.

Rauda has failed to show the instruction on the kill zone resulted in prejudice requiring reversal.  (See *Cummiskey, supra*, 3 Cal.4th at p. 1029 [court must draw all reasonable inferences in favor of the indictment]; *Jablonski, supra,* 37 Cal.4th at p. 800 ["defendant must show the 'alleged errors before the grand jury deprived him of a fair trial or otherwise resulted in any actual prejudice relating to his conviction' before reversal on the ground of such irregularity is warranted"].)[3]

---

[3]    Under these circumstances, we need not address Rauda's argument that the prosecutor's description of the kill zone theory was legally erroneous during the People's presentation to the grand jury.  The grand jury was instructed on the kill zone theory

14

C.	*Rauda Forfeited His Confrontation Clause Claim*

Rauda next argues his right to confront the witnesses against him under the state and federal constitutions was violated when the People's firearms expert, Los Angeles County Sheriff's Deputy Manuel Munoz, testified "at length" about the ballistics testing and conclusions of another firearms expert, Los Angeles County Sheriff's Deputy John Vanderschaaf. Deputy Vanderschaaf testified at trial, but on the topic of bullet trajectories. Rauda relies on *Smith v. Arizona* (2024) 602 U.S. 779, 783 for the proposition that "a prosecutor cannot introduce an absent laboratory analyst's testimonial out-of-court statements to prove the results of forensic testing."

As Rauda acknowledges, his counsel failed to timely object or move to strike Deputy Munoz's testimony regarding Deputy Vanderschaaf's ballistics testing and conclusions. Rauda has thus forfeited his confrontation clause claim. (See *People v. Saunders* (1993) 5 Cal.4th 580, 589-590 [constitutional claims forfeited absent timely objection in trial court]; see also *People v. Demetrulias* (2006) 39 Cal.4th 1, 19-20 ["[w]e conclude defendant forfeited the issue of the evidence's admission by his failure to make a timely objection on this ground"]; Evid. Code, § 353, subd. (a) [verdict or finding shall not be reversed by reason of erroneous admission of evidence unless "[t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made"].)

---

by the legal advisor to the grand jury, and Rauda does not contend the legal advisor's instruction was inaccurate.

Any error arising from Deputy Munoz's ballistics testimony was harmless beyond a reasonable doubt because Deputy Vanderschaaf did testify at Rauda's trial.  (See *People v. Sanchez* (2016) 63 Cal.4th 665, 699.)  Although Rauda had the opportunity to question Deputy Vanderschaaf about his ballistics testing and conclusions, Rauda did not do so.  We are not persuaded by Rauda's argument that he could not have questioned Deputy Vanderschaaf about the ballistics testing and his conclusions because those topics were not addressed during Deputy Vanderschaaf's direct examination.  (Evid. Code, § 773, subd. (a).)  Had defense counsel inquired, the court had discretion to allow Rauda to question Deputy Vanderschaaf about these topics.  (Evid. Code, § 772, subd. (c) ["a party may, in the discretion of the court, interrupt his cross-examination . . . of a witness, in order to examine the witness upon a matter not within the scope of a previous examination of the witness"].)  Rauda concedes his counsel could have "recall[ed] [Deputy Vanderschaaf] to cross-examine him after Munoz's testimony," yet never sought to do so.  Rauda has thus also forfeited his confrontation clause claim by failing to recall or question Deputy Vanderschaaf about his ballistics testing and conclusions.  (See *People v. Saunders, supra,* 5 Cal.4th at pp. 589–590.)

We reject Rauda's claim he received ineffective assistance of counsel because his trial counsel failed to object to Deputy Munoz's testimony and failed to recall Deputy Vanderschaaf.  A defendant claiming ineffective assistance of counsel in violation of the Sixth Amendment must show not only that his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, but also that it is reasonably probable that, but for counsel's failings, the result

16

would have been more favorable to the defendant.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 694.)  " 'The burden of sustaining a charge of inadequate or ineffective representation is upon the defendant.  The proof . . . must be a demonstrable reality and not a speculative matter.' " (*People v. Karis* (1988) 46 Cal.3d 612, 656.)  There is a presumption the challenged action " 'might be considered sound trial strategy' " under the circumstances.  (*Strickland,* at p. 689; accord, *People v. Dennis* (1998) 17 Cal.4th 468, 541.)

On direct appeal, a conviction will be reversed for ineffective assistance of counsel only when the record demonstrates there could have been no rational tactical purpose for counsel's challenged act or omission.  (*People v. Lucas* (1995) 12 Cal.4th 415, 442 ["[r]eviewing courts reverse convictions on direct appeal on the ground of incompetence of counsel only if the record on appeal demonstrates there could be no rational tactical purpose for counsel's omissions"]; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1058 [" '[i]f the record sheds no light on why counsel acted or failed to act in the manner challenged, "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation" [citation], the contention [that counsel provided ineffective assistance] must be rejected' "].)  "[T]he decision to object or not object to the admission of evidence is inherently tactical, and a failure to object will seldom establish ineffective assistance." (*People v. Beasley* (2003) 105 Cal.App.4th 1078, 1092; *People v. Ferraez* (2003) 112 Cal.App.4th 925, 934–935.)

Here, Rauda's counsel reasonably could have determined he could more effectively cross-examine Deputy Munoz on the ballistics topic than Deputy Vanderschaaf.  Counsel could also

have determined testimony by Deputy Vanderschaaf on the ballistics evidence was cumulative to Deputy Munoz's and would only strengthen the evidence against Rauda.  Because the record on appeal is devoid of affirmative evidence that defense counsel had no conceivable tactical purpose for not objecting, Rauda's claim of ineffective assistance is more appropriately made in a petition for habeas corpus.  (See *People v. Lopez* (2008) 42 Cal.4th 960, 972; *People v. Avena* (1996) 13 Cal.4th 394, 419.)

D.     *The Trial Court Did Not Abuse Its Discretion When It Excluded Evidence of the Post-arrest Shooting*

Rauda argues the trial court prejudicially erred when it excluded evidence that someone purportedly shot at a white luxury vehicle in the Malibu area two weeks after he was arrested.  Rauda contends this was evidence of third-party culpability that would have created a reasonable doubt of his guilt, and its probative value was not substantially outweighed by the danger of undue prejudice, of confusing the issues, or of misleading the jury under Evidence Code section 352.

1.     *Relevant Proceedings*

Before trial, the People moved to exclude, among other things, evidence that "[Carly] Pointer reported [] she was shot at while driving on Las Virgenes Canyon Road, somewhere in the vicinity of the Hindu Temple, on October 28, 2018 at approximately 12:40 p.m."  Pointer reported to the police she heard a bang, believed it was a gunshot, looked to her right, and observed a perfectly round hole a little smaller than the size of a quarter in the passenger window.  The window then shattered.  Pointer called 911 when she arrived at work and the police

18

investigated the incident. In the incident report, the investigating officer "form[ed] the opinion that victim Poynter's vehicle had not been shot with a weapon, due to the fact that the damage only occurred to the front passenger window. The vehicle did not sustain any other damage from this incident. If the vehicle had been shot with a firearm, victim Poynter would have endured possible injuries or the bullet would have penetrated other parts of the vehicle."[4]

The People argued the evidence did not amount to third-party culpability evidence because there was no identified third party, and the police concluded Pointer's car was not damaged by a bullet. Further, the People highlighted the differences between the shootings alleged in the indictment and the Pointer incident: the incident involving Pointer occurred at 1 p.m., while the other shootings occurred in the pre-dawn hours of 3 a.m. to 5 a.m.; Pointer described the hole as the size of a diced cucumber or smaller than a quarter; and the forensic evidence, unlike the bullet holes found in the other cars, did not indicate the damage was from a bullet.

The defense argued the evidence could raise a reasonable doubt as to Rauda's guilt because "it indicates that there's . . . a third party who committed the crimes, because it fits the same m.o., if you will. I don't have a name for that person, but the conduct that took place matches exactly." Defense counsel observed the incident involving Pointer occurred two weeks after Rauda was arrested on October 10, 2018, and counsel pointed to the similarities of that incident to the other shootings in the indictment: the shootings took place in the same area and from

---

[4]     Pointer's name is spelled two different ways in the record.

the same side of the street; they occurred within a few weeks of one another; the shootings involved white luxury cars (Pointer drove a white Audi, Kincaid drove a white Tesla, Marshall drove a white Porsche, Katz drove a white BMW); the shooter accurately hit moving cars, and the cars were shot with a firearm. Counsel also argued Pointer stated her driver-side window may have been down so, according to counsel, a bullet could have traveled through one window and out the other. Defense counsel argued there would be a "massive due process problem if a similar act, in [a] similar area, similar time frame was just hidden from the jury."

After hearing argument by the parties over two days, the trial court excluded evidence of the Pointer incident pursuant to Evidence Code section 352 and because there was insufficient evidence to establish that the damage to the car was caused by a bullet. The court concluded that Rauda was "asking the jury to speculate as to one of the main foundational things, that it [Pointer's car] was actually a shot." The court explained, "The reason the other counts are consistent with somebody concluding that it was a shot is because there was physical evidence to support that, with regard to the ballistics."

2. *Governing Law and Standard of Review*

" 'A criminal defendant has a right to present evidence of third party culpability if it is capable of raising a reasonable doubt about his own guilt. The rule does "not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a

20

defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." ' " (*People v. Panah* (2005) 35 Cal.4th 395, 481.)

*People v. Hall* (1986) 41 Cal.3d 826, 829 (*Hall*) "reaffirm[ed] the admissibility of any relevant evidence that raises a reasonable doubt as to a defendant's guilt, including evidence tending to show that a party other than the defendant committed the offense charged.  Such evidence may be excluded only when the court properly exercises its discretion under Evidence Code section 352 to reject evidence that creates a substantial danger of undue consumption of time or of prejudicing, confusing, or misleading the jury."  Evidence Code section 352 permits "[t]he court in its discretion [to] exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"As with all evidentiary rulings, the exclusion of third party evidence is reviewed for abuse of discretion." (*People v. Turner* (2020) 10 Cal.5th 786, 817.)[5]

_____

[5]     Rauda contends his claim should be reviewed de novo because it implicates his constitutional due process right to present a complete defense.  But, the application of Evidence Code section 352 to evidence of third-party culpability does not impair such a "[defendant's] constitutional right to present a defense. . . .  the ordinary rules of evidence do not impermissibly infringe [upon an] accused's right to present a defense[, and] [c]ourts retain[] a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of

21

3.      *The Trial Court Did Not Abuse Its Discretion When It Excluded Evidence of the Pointer Incident*

Rauda contends the evidence that someone shot at Pointer's white Audi near the area of the other shootings could raise a reasonable doubt as to the identity of the shooter and was admissible under *Hall, supra,* 41 Cal.3d at page 833. Additionally, Rauda argues the evidence should not have been excluded under Evidence Code section 352.

In *Hall,* the Supreme Court held the trial court improperly rejected the defendant's offer of proof because it concluded the defendant was required to make a preliminary showing of " 'substantial probability' " that the third party actually committed the crime. (*Hall, supra,* 41 Cal.3d at p. 833.) *Hall* held the court's proper inquiry was not substantial probability but rather whether the evidence could raise a reasonable doubt as to the defendant's guilt, and if so, then courts are to assess whether the evidence should be admitted under section 352. (*Ibid.*) That was what the trial court did here. The court determined the evidence relating to the Pointer incident could not raise a reasonable doubt as to Rauda's guilt because it was speculative whether Pointer's car was shot at all. The only evidence that someone shot at Pointer's car was Pointer's statement to the police that she heard a loud bang and thought it was a gunshot; she then looked to her right and saw a hole in her passenger window, which shattered the glass. The police

_____

orderly procedure and the avoidance of prejudice." (*Hall, supra,* 41 Cal.3d at p. 834.)

investigation revealed no ballistic evidence of a bullet.

Under these facts, the trial court did not abuse its discretion by excluding the evidence of Pointer's incident. " '[A]n abuse of discretion arises if the trial court based its decision on impermissible factors . . . or on an incorrect legal standard.' " (*People v. Gonzalez* (2024) 103 Cal.App.5th 215, 225.) Unlike in *Hall,* the trial court did not base its decision on impermissible factors or an incorrect legal standard.

Rauda alternatively contends that evidence of the Pointer incident should have been admitted under Evidence Code section 352 because it was highly probative, would not have required undue consumption of time, and did not create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. Rauda points to the similarities between the Pointer incident and the shootings at white luxury vehicles in that area. He contends presentation of this evidence would not have taken undue time, as it would likely have involved testimony by only two or three witnesses (i.e., Pointer and the investigating officers). Moreover, it would not have confused the issues since "[i]t simply would have been evidence of another similar potential shooting for the jury to consider."

We need not reach the balancing test required by Evidence Code section 352 because we have found the evidence does not raise a reasonable doubt as to the defendant's guilt. *Hall, supra,* 41 Cal.3d at page 833 sets out the sequence of the inquiry as follows: "The court's proper inquiry was limited to whether this evidence could raise a reasonable doubt as to defendant's guilt and then applying section 352." In all events, the trial court did not abuse its discretion when it excluded this evidence under Evidence Code section 352. The probative value of this evidence

23

was minimal. As stated, it was speculative whether Pointer's car was shot at all. This evidence would thus have created a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

Rauda also contends the trial court "improperly made factual findings that should have been reserved for the jury," citing *Hall, supra,* 41 Cal.3d at page 834. But, *Hall* recognized the trial court's power to weigh the facts when assessing defense counsel's offer of proof in this context: "an inquiry into the admissibility of such [third party culpability] evidence and the balancing required under section 352 will always turn on the facts of the case. Yet courts must weigh those facts carefully. They should avoid a hasty conclusion . . . that evidence of [the third party's] guilt was 'incredible.' Such a determination is properly the province of the jury." (*Ibid.*) *Hall* confirms the trial court must weigh the facts of the case "carefully" and "avoid a hasty conclusion." Here, the record discloses the trial court carefully considered extensive arguments over two days to avoid a hasty conclusion.

## DISPOSITION

The judgment is affirmed.


MARTINEZ, P. J.

We concur:


SEGAL, J.                            FEUER, J.

24